METZ v. COMMERCIAL BANK.

COMMERCIAL BANK v. METZ.

1. EXCEPTION.—An exception to a report of the master, which does not state the matters excepted to, will not be considered.
2. PARTNERSHIP.—A private banking partnership, by its articles of agreement, was to dissolve on a certain day, but on that day owed

large sums to depositors, and had large credits outstanding; the partners agreed to proceed to wind up the business, the bank was kept open at the old place, same sign remained, same officers in charge, no notice to public of dissolution. *Held*, that the facts sustained a finding that a partnership under the old articles continued. MR. JUSTICE GARY *dissenting*.

3. IBID.—One partner has the right to bind the partnership, even after date of dissolution, by terms of articles, if partnership is continued to wind up business, and no disapproval is expressed by other partner, and there is no collusion or fraud on the part of acting partner to injure the other, when such liability is for the purpose of winding up the partnership affairs.

4. COLLATERAL SECURITY—ASSIGNEE.—When choses in action are assigned as collateral security, they are the property of the assignee only to the extent necessary to pay the secured debt, and must be accounted for by assignee.

5. CORPORATION.—Amounts deposited by subscribers to the capital stock of a corporation to the order of the agent of the corporators, may be included in the amount required under the statute to be paid in, to entitle corporators to receive a certificate of charter from Secretary of State.

Before ALDRICH, J., Columbia, September 14, 1894. Affirmed.

The facts are fully stated in the following Circuit decree:

The action first above entitled was begun in March, 1891. The complaint alleged a partnership between plaintiff and defendant, C. J. Iredell, under the firm name of "The Commercial Bank of Columbia, S. C.," formed on July 16th, 1883, to continue for five years from September 1st, 1883, "for the conduct of a general private banking business in the city of Columbia, S. C.;" that this partnership existed until September 1st, 1888, by virtue of the articles of copartnership; "that upon said date the plaintiff did inform the said Iredell of his intentions and desire to ask for, and to have, a settlement of the said partnership affairs, in accordance with the articles of agreement hereinbefore set forth; that from the nature and character of the business of said bank, it was impossible to wind up its affairs, to collect in its assets, and pay off its debts within a short time, and the

said C. J. Iredell was permitted, in view of this fact, and
for the purpose of collecting in the assets and paying off
liabilities of said bank, to continue the business until the
same could be settled up without material loss to the part-
nership, which, as plaintiff understood, would take but a
few months." * * * "That the said C. J. Iredell continued
to manage and control the said business of the partnership,
and to collect in the assets of the same, and to pay off the
debts and liabilities thereof, until at the close of the busi-
ness on the 8th day of March, 1889, when said partnership
was finally dissolved, a settlement of its affairs made, and
its operations closed, and its business ceased as a bank and
firm."

The complaint further alleges, that the defendant, C. J.
Iredell, grossly mismanaged the partnership business, and
fraudulently misapplied the partnership assets; that the
defendant, "Commercial Bank of Columbia, S. C.," was a
chartered bank (with which plaintiff has no connection)
that had been built up upon the dissolved partnership bank,
taken to itself the good will, property, and assets of the
latter, employed the same officers, and by fraudulent collu-
sion with C. J. Iredell, who was president of the new bank,
had deprived plaintiff of his rights and property, by enabling
Iredell to misappropriate, and the chartered bank to acquire,
assets of the partnership, leaving debts unpaid; that by rea-
son thereof, the chartered bank was due to plaintiff the sum
of $45,000, and C. J. Iredell, on proper accounting, a very
considerable amount. S. S. Meetze, a creditor, was made
a party defendant, and as a representative of creditors.

The relief demanded was the appointment of a receiver
of the partnership assets, an accounting by Iredell of the
partnership business; that the defendant bank account to
plaintiff for all property of the partnership received without
authority, and be required to surrender to plaintiff all real
and personal property of the partnership still in its posses-
sion; that creditors of the partnership be called in; that S.
S. Meetze, creditor, and all other creditors, be enjoined from

prosecuting actions at law against the partnership, and that the defendants, Iredell and Commercial Bank, be enjoined from any disposition of the partnership assets. Said complaint is sixteen pages (typewritten) long, containing other incidental matters, and some of them will be referred to further on. To understand the issues fully and in detail, the complaint must be read; the foregoing is only an outline of the material allegations.

The defendant, Iredell, answered, denying any improper conduct on his part, admitting the transfer of property and assets to the chartered bank, but alleges that said transfers were always upon full and valuable consideration; expressing a willingness to account, and alleging that very little would be found due to plaintiff on such accounting; that the partnership had continued by agreement after March 8th, 1889, alleging "that the plaintiff knew that the business was not closed, but would have to be continued in a modified form, in order to work off the old accounts by new loans and renewals," &c.

The defendant bank, by its answer, denied all improper conduct on its part, denied any indebtedness to plaintiff, admitted the possession of property that once belonged to the partnership, but alleged that it had been acquired by this defendant through Iredell for full value; that the partnership was indebted to defendant bank to a very considerable amount, and that plaintiff was responsible for such amount when ascertained, as the partnership continued to exist and Iredell had power as partner, and also by express authority of plaintiff to make the transfers and loans, which constituted the transactions between the partnership and the defendant bank.

Upon the pleadings and affidavits submitted, Judge Hudson directed creditors of the partnership to be called in by publication, enjoined them from otherwise taking action, appointed a receiver of the partnership, and referred it to the master for Richland County to take all the testimony, and report the same, with his conclusions of fact thereon,

to this Court; also state the account of the said partnership
between the plaintiff and defendant, Jredell, and of its assets
and liabilities, and that Iredell account for the assets of the
partnership received by him after the alleged dissolution,
and for his actings and doings therewith.

The action second above entitled was begun by the "Com-
mercial Bank of Columbia, S. C.," against Levi Metz in
March, 1891, to recover an alleged overdraft represented by
three checks drawn by Levi Metz on the Commercial Bank
and paid by plaintiff. Defendant answered, alleging that
the checks were drawn by him on the partnership bank,
and improperly paid by plaintiff and charged to defendant,
and that the partnership upon which he drew was indebted
to him to an amount in excess of the checks. so drawn.

The second action was also referred to the master to hear
along with the first action, and to take the testimony in the
case upon all the issues arising under the pleadings, and
that he report his conclusions of fact thereon.

Both causes being thus before the master, the testimony
was taken by him, and the defendant, Iredell, accounted for
his management of the partnership. The master made his
report upon the facts, but having failed to state definitely
the accounts, as directed by the order of reference, Judge
Witherspoon recommitted the cause to him, with directions
to state these accounts, and also his conclusions upon the
issues of law. The master then filed his second report.
These two reports of the master cover fifty-nine typewritten
pages, and show a full consideration of the matters submit-
ted to him. No exceptions were taken to these two reports
by any of the parties to the cause or by any of the creditors
before the Court, under its call, except Levi Metz, the plain-
tiff in the first and the defendant in the second action, who
has filed over eighty exceptions, in the aggregate covering
over fifty-three typewritten pages.

On the pleadings, the two reports of the master, with the
testimony and other exhibits thereto, and the exceptions to
these reports, the causes came on for a hearing before me at

July term, 1894, in Columbia, S. C. The pleadings, evidence, reports, and exceptions make up huge volumes of manuscript, something over 1,700 pages. In this mass of manuscript I find over 100 exhibits, covering pages of paper, purporting to state accounts in figures. These accounts have perplexed me greatly, involving, as they do, the financial transactions of a considerable banking business, extending over a considerable period of time. Each party to the actions has a particular theory or system by which these statements should be prepared. This question has been carefully considered, because some of the statements are said to be misleading, and intentionally so. This is the charge against the defendant, Iredell. The case was elaborately argued by counsel, who have submitted copies of their arguments, amounting in the aggregate to over 400 pages. I listened to these arguments with much attention, and have read them over with that care required by the importance of the case, and the pleasure I always derive from the perusal of masterly efforts. Every branch of the case has been discussed, and the law applicable to every possible view of the facts cited. I have given to these cases earnest and careful consideration, without reference to time and labor. The master's report of October, 1892, is a carefully prepared statement of the facts of these cases, upon all of the issues involved, logically and chronologically arranged, and makes a full finding of fact upon all the questions raised. To restate the facts in these cases would be to repeat, in substance, the findings of this report, and would add 100 pages to this already long litigation. Many—indeed, nearly all—of the findings of the master have been excepted to by Levi Metz; but I think that the testimony, and the weight of the testimony, support the findings of the master. On some of the matters so found there was conflict of testimony. Where the master hears the testimony as delivered, and sees the witnesses as they testify, "his decision on the facts should be generally adopted by the chancellor." *Gee* v. *Hicks*, Rich. Eq. Cases, 20. I think that this case falls properly within this rule. The master's

report and his findings are adopted in these cases, and stands as the facts of the two actions. All the exceptions to said report are overruled. The facts being as thus found by the master, and approved by this Court, the second report of April 7th, 1894, follows as a necessary consequence. ·

Some of the counsel laid considerable stress upon certain terms and words used by the master, and argued that said terms and words, instead of supporting the conclusions reached by the master, supported widely different conclusions. Counsel have the right to press this line of argu-· ment, but a consideration of the master's report, when considered as a whole, as it should be, shows that his conclusions are sound.

The partnership undoubtedly continued as a partnership at will after September 1st, 1888, and there being no agreement after that date as to a dissolution, the partnership will be presumed to have continued; for the Court will not, from the cessation of active banking business, infer a dissolution, where one of the main purposes of the partnership, the receiving and paying out of money on deposit, has not been accomplished so far as the paying out of deposits was concerned, and the partnership, as such, was not in a condition to accomplish it according to contract, without borrowing money from others. I therefore think that the partnership continued after March 8th, 1889—at least, as to all debts by deposit then due by the partnership, and to the extent of vesting Iredell with the right to use the partnership name and assets in raising money to pay off such deposits. And I further hold that Iredell had the power to bind the partnership by contracts made in the partnership name, under the authorization of Levi Metz. These conclusions are based upon the findings of the master as well as a consideration of the facts and the law of these actions; without intending to question or vary in the slightest the findings of the master, I will very briefly refer to one or two of the leading issues, and consider them in the light of the pleadings and evidence.

Did the partnership between Metz and Iredell terminate

on September 1st, 1888? That was the date upon which it was to terminate under the "articles of agreement," and if nothing else appeared, if no continuance of the partnership by consent is shown, then the law is that the partnership terminates upon that day, and the law applicable to dissolved partnerships would control and limit the acts of the ex-partners.

Plaintiff, in his complaint, paragraph two, says that on September 1st, 1888, "from the nature and character of the business of said bank, it was impossible to wind up its affairs, to collect in the assets and pay off its debts within a short time, and the said C. J. Iredell was permitted, in view of this fact, and for the purpose of collecting in the assets and of paying off the liabilities of said bank, to continue the business until the same should be settled up without material loss to the partnership." Iredell, then, under plaintiff's permission, had authority "to continue the business until the same could be settled up without material loss to the partnership." What "business" was Iredell "permitted" to continue? Plaintiff, in argument, and during the trial, says, "Winding up the affairs of the dissolved partnership." The master says the "business" to be continued was the general business of the partnership, banking and all else. Iredell says it was "to continue" the old business, called for by the articles of agreement. The "business" of the partnership, as a fact, was "permitted" to be carried on after September 1st, just as it was conducted prior to that date.

Again, in paragraph seven of the complaint, it is alleged, "its (the partnership's) operations closed and its business ceased as a bank and firm" on March 8th, 1889. If the "business" of the partnership, "as a bank and firm," terminated on September 1st, 1888, by virtue of the articles of agreement, why should it "cease" business as a bank and firm "on March 8th, 1893." The "business" was not wound up, because the partnership owed money to depositors. Plaintiff contends, as stated, that his "purpose" was that Iredell should "wind up" the affairs of the partnership.

Counsel have argued at length, and with great force, to show that, no matter what a man's purpose or belief may be, if he does certain acts, or uses certain language, the law says certain results are the consequences of such acts and language. Apply this rule here; plaintiff "permitted" Iredell "to continue the business" of the bank; the substantive fact, then, is, the banking business was continued by plaintiff's permission after September 1st, 1888, and the partnership then became a partnership at will.

Let us assume that plaintiff's "purpose" in continuing the business was known to Irèdell, and that Iredell understood plaintiff's "purpose," and was carrying that into operation, how about the customers and others who dealt with the bank? These parties saw the bank, day after day, before and after September 1st, 1888, conducting a regular business, and they dealt with it as a bank; no notice of dissolution of the partnership, or a cessation of business, was given to any customer of the bank.

Counsel for plaintiff urge, and with vigor, that W. H. Lyles, Esq., at one time president of the defendant bank, and a director and the attorney thereof since its organization, drew the articles of copartnership between plaintiff and Iredell, and, therefore, he had notice of the same, and that defendant bank, through Lyles, had notice of the articles of copartnership.

The master in his first report, finding forty-nine, correctly says: "The articles of copartnership were never recorded, and was known only to plaintiff and C. J. Iredell, and in a general way to James Iredell; Mr. W. H. Lyles drew them up, but before March, 1889, he had forgotten their terms, except that the said C. J. Iredell had the management of the concern."

It is hardly to be supposed that Mr. Lyles, or any other lawyer, can remember the terms of contracts drawn by them, in the ordinary course of practice, five or six years after he has handed them to his clients, and lost sight of the same. The law does not expect men to have such memories.

Plaintiff did not record the articles of copartnership, and no one seems to have ever seen this paper until plaintiff contemplated this suit. But suppose Mr. Lyles, as matter of fact, did remember the contents of the articles of agreement, and, as a customer of the bank, saw the business going on after September 1st, 1888, with plaintiff's permission, he would know, or have the right to assume, that the partnership had been continued and existed at will.

Plaintiff says that he left the management of the business entirely to Iredell; never examined into it, because he had such unbounded confidence in Iredell. When did that confidence begin, and did Lyles know, or should he have known, of this fact? The master says plaintiff is a shrewd business man, and his confidence in Iredell, his blind faith in his financial skill and integrity, as testified, while worthy of admiration as an exhibition of faith, is not regarded as an ordinary method in the conduct of a large, important, and valuable business. When the articles of copartnership were signed, plaintiff did not expect to take Iredell's word for everything, because it is specifically stated in the articles of copartnership that "the party of the second part, C. J. Iredell, agrees * * * to keep a complete set of books, showing plainly at all times the condition of said business, and have the same constantly open for the inspection of said Levi Metz or his legal representative, to furnish said Levi Metz all desired information as to the condition of said business." Mr. Lyles, if he had knowledge of the articles of agreement, knew of this clause, and naturally he would suppose that Mr. Metz availed himself of his contract right to inspect the books and business of the firm in person or by "his legal representative." While Mr. Lyles might not, as a lawyer, conclude that Mr. Metz's frequent visits to the bank were for the purpose of inspecting the books and looking into the business of the firm, an ordinary business man would be apt to think that his visits were for that purpose.

The master in his fifteenth findings near the end says: "No intimation was given to its (the partnership's) custom-

ers or the public that there had been any change in the business of the bank or in the relations of the parties to it," on the 8th March, 1889.

C. J. Iredell, as cashier of a bank, seems to have been a success, but as president or manager of a bank, a failure. As manager, he lost large sums of money, and, as he is insolvent, the question is, who must bear the loss? Mr. Metz took him into business as his partner, and held him out to the world as the manager of that business. The defendant or chartered bank did business with Iredell as such manager, and it seems to me that Mr. Metz must bear the loss.

It is unnecessary to repeat the findings of the master. The exceptions to the master's report are all overruled.

There are one or two matters of law raised by the pleadings, but not passed upon by the master, and I will now dispose of them. The defendant bank claims that this Court should pass upon the allegations of the eleventh paragraph of the complaint, that the corporators of the bank had falsely certified to the Secretary of State, in March, 1889, that twenty per cent. of the subscribed capital stock of the chartered bank had been paid in. Counsel for Levi Metz say nothing, or but little, about this matter in their arguments before me, but the charge remains in the record, under the facts found by the master and approved by this Court. I hold that the subscription of J. K. Davis and G. W. Williams and the money paid to James Iredell were, as matters of law, money paid over to the new bank, and on deposit in banks of good standing, subject to the draft of the agent of the new bank—such payments exceeded twenty per cent. of the capital stock then subscribed, and the certificate to the Secretary of State in this regard was true. The master, in his seventy-fifth and seventy-sixth findings of fact, which have been approved by this Court, finds that Levi Metz intentionally drew three checks in January, 1891, aggregating $5,700, on the defendant bank, which paid them, without any funds on deposit to the credit of said Metz. Metz is, then, liable to

the defendant bank for the overdraft account thus created by him, unless it has been extinguished by the check, deposit slip, and book entries stated in findings 77–80. I hold that the overdraft account of Levi Metz was not so extinguished. These several papers were not money, and no money was realized upon them. Levi Metz had nothing whatever to do with their execution or deposit, and had no knowledge or information whatsoever of them until they had been cancelled on the books where credited. He has not been injured or affected by the erroneous book entries made in his favor, but subsequently corrected.

It is, therefore, the judgment of this Court, that the defendant, C. J. Iredell, is indebted to the plaintiff, Levi Metz, in the sum of $46,802.29, with interest thereon from April 7th, 1894, making an aggregate of $48,112.75, and that plaintiff have leave to enter up judgment and issue execution against C. J. Iredell for the said sum of $48,112.75, to be credited with any collections hereafter made or moneys received on assets of said partnership when received by said Levi Metz.

2. That the plaintiff, Levi Metz, and the defendant, C. J. Iredell, as former partners under the firm name of "The Commercial Bank of Columbia, S. C.," are indebted to the defendant corporation, "Commercial Bank of Columbia, S. C.," in the following amounts:

| | | |
|---|---:|---:|
| Gibson overdraft | $2,500 | 00 |
| Interest seven per cent. from March 9th, 1889, to September 1st, 1894 | 958 | 84 |
| Eleven notes | 38,320 | 37 |
| Interest from date of maturity to September 1st, 1894 | 9,704 | 80 |
| Balance overdraft account | 1,659 | 23 |
| Interest from January 27, 1892, to September 1, 1894, at seven per cent | 302 | 90 |
| Green certificate | 1,000 | 00 |
| Interest from March 1st, 1889, to September 1st, 1894, at six per cent | 350 | 00 |

| | | |
|---|---:|---:|
| Ford certificate........................................... | 100 | 00 |
| Interest from August 1st, 1890, to September 1st, 1894, at six per cent....................... | 24 | 50 |
| Total..................................................$54,920 | | 64 |

And that the said defendant corporation, "Commercial Bank of Columbia, S. C.," have leave to enter up judgment and issue execution against said Levi Metz and C. J. Iredell, late partners under the firm name of "The Commercial Bank of Columbia, S. C.," for $54,920.64.

3. That the defendant, Levi Metz, in the second action is indebted to the plaintiff corporation in that action in the further sum of $5,700, with interest thereon from the 8th January, 1891, to September 1st, 1894, aggregating at said date $6,934.82, and that said plaintiff corporation have leave to enter up judgment and issue execution against the said Levi Metz for the said sum of $6,934.82.

4. That the defendant, C. J. Iredell, is indebted to said defendant corporation in the first action, "Commercial Bank of Columbia, S. C.," in the sum of $4,305, for which sum the said defendant bank may enter up judgment and issue execution.

5. That the said Levi Metz and C. J. Iredell, partners as aforesaid, are indebted to A. C. Alexander in the sum of $750, with interest at six per cent. per annum from July 22d, 1890, making an aggregate of $934.86, for which amount the said A. C. Alexander may enter up judgment against the said Levi Metz and C. J. Iredell as partners as aforesaid.

6. That the holders of the several undisputed certificates of deposit, scheduled in exhibit V. to the master's first report, are entitled to be paid the amounts respectively due them, with interest on so much thereof as is principal from the date of said report; and that the owners and holders of said certificates have leave to enter up judgment and issue execution against said Levi Metz and C. J. Iredell, partners as aforesaid, for the said several sums and interest.

From this judgment Levi Metz appeals on the following exceptions:

1st. Because his Honor erred in said decree in holding that "The partnership undoubtedly continued as a partnership at will after September 1st, 1888, and there being no agreement after that date as to a dissolution, the partnership will be presumed to have continued; for the Court will not, from the cessation of active banking business, infer a dissolution, when one of the main purposes of the partnership, the receiving and paying out of money on deposit, has not been accomplished, so far as paying out of deposits was concerned, and the partnership as such was not in a condition to accomplish it according to contract without borrowing money from others. I, therefore, think that the partnership continued after March 8th, 1889—at least, as to all debts and deposits then due by the partnership, and to the extent of vesting Iredell with the right to use the partnership name and assets in raising money to pay off such deposits." Whereas his Honor should have held that on the 1st day of September, 1888, the said partnership between the plaintiff, Levi Metz, and the defendant, C. J. Iredell, under the name of "The Commercial Bank of Columbia, S. C.," having expired by the termination of the articles of partnership entered into by said partners on the 16th day of July, 1883, was then dissolved; and the evidence before his Honor upon said trial showing that the said Levi Metz had refused to renew said partnership, no partnership at will could be presumed from the unauthorized acts of the said Iredell; and his Honor should have further held that on the 8th day of March, 1889, that said partnership was dissolved, notice thereof given to the public and the defendant bank, and that said Iredell after that date had no authority to bind the said Levi Metz in the creation of any new debts, in the borrowing of any money upon the assets and name of the partnership to pay off deposits then due, without the express authority of the said Levi Metz.

2d. Because his Honor erred in holding as a conclusion

of fact: "That the said Iredell had the power to bind the partnership by contracts made in the partnership name, under the authorization of Levi Metz." Whereas he should have found from the evidence that said C. J. Iredell, neither after the 1st September, 1888, nor the 8th March, 1889, had any authority, directly or indirectly, from Levi Metz to use the partnership name to borrow money to pay deposits, or for any other purpose, or to bind the said Levi Metz upon any contracts in the partnership name.

3d. Because his Honor erred in holding in said decree that the partnership of Levi Metz and C. J. Iredell, entered into on the 16th day of July, 1883, under the name of "The Commercial Bank of Columbia, S. C.," was not dissolved as between said partners on the 1st day of September, 1888, the period to which said partnership was limited by the articles of partnership between said partners.

4th. Because his Honor erred in holding that said partnership, after the 1st of September, 1888, became a partnership at will, when there was no evidence whatever to support said ruling.

5th. Because his Honor erred in holding that said partnership continued after the 1st of September, 1888, when the evidence and findings of the master showed that no agreement was made by said partners to renew said partnership before, on or after said date, but, on the contrary, the evidence and the findings of the master showed that an agreement was then made by said partners to wind up the affairs of said partnership.

6th. Because his Honor erred in holding that said partnership was not dissolved on the 8th day of March, 1889, when the evidence and the master's findings of fact, in his first report, showed that at that date the business of the said partnership bank ceased as a banking institution; it made no loans, discounted no notes, took no ordinary deposits, and sold no exchange; which said several matters constituted the sole business of the partnership. Its collections were made through the collecting department of

the defendant bank—of all of which the defendant bank had notice.

7th. Because his Honor erred in holding that, after the 8th day of March, 1889, the said partnership was a partnership at will, when the evidence and the finding of fact of the master in his first report showed that at that date the defendant bank was chartered and began business with almost the identical name, with the same officers, banking rooms, vault, stationery, sign, pass-books, and checks as the old bank, and with its good will and customers; and that the said C. J. Iredell, the manager of the old or partnership bank, became the president and a director of the chartered bank, and was in reality the managing spirit thereof, positions wholly inconsistent with his duty to the partnership bank; and that the defendant bank purchased from said Iredell, who assumed to act also for the partnership bank, all the available assets of the partnership, and succeeded to its business.

8th. Because his Honor erred in holding as follows: "That the partnership undoubtedly continued as a partnership after the 8th day of March, 1889, and, there being no agreement after that date as to a dissolution, the partnership will be presumed to have continued; for the Court will not, from the cessation of active banking business, infer a dissolution, when one of the main purposes of the partnership, the receiving and paying out of money on deposit, has not been accomplished, so far as the paying out of deposits was concerned, and the partnership as such was not in a condition to accomplish it, according to contract, without borrowing money from others. I, therefore, think the partnership continued after the 8th day of March, 1889—at least, as to all debts by deposit then due by the partnership, and to the extent of vesting Iredell with the right to use the partnership name and assets in raising money to pay off such deposits." Whereas he should have found that on and after said 8th day of March, 1889, that said partnership was dissolved, the mutual agency of the part-

ners to bind each other was at an end, but that a deposit being an ordinary obligation to pay money by the partnership bank to its depositors on demand, was not such a continuing contract as would authorize the said Iredell to borrow money after the dissolution of the partnership in the partnership name.

9th. Because his Honor erred in holding: "That said Iredell had the power to bind the partnership by contracts made in the partnership name under the authorization of Levi Metz."

10th. Because his Honor erred in holding that no notice of the dissolution of the said partnership, or a cessation of the business, was given to any customer of the partnership or to the public, either on the 1st of September, 1888, or March the 8th, 1889. Whereas he should have held, in the language of the master in his fortieth finding of fact of his first report: "That the closing of the partnership bank and opening of the chartered bank was thoroughly published, and circulars issued to the debtors of the partnership bank, informing them of the change;" and that the defendant bank, as well as all creditors and customers of said partnership, had sufficient knowledge of the affairs of the partnership to put them upon inquiry; and that the witness, W. H. Lyles, who drew the articles of partnership, and was a director of the defendant bank, and had personal knowledge of the contract of partnership, knew the contents thereof; and his Honor erred in holding that the law permitted Mr. Lyles to forget the contents of said articles of partnership.

11th. Because his Honor erred in holding that the said partnership was liable to the defendant bank in the sum of $54,920.64, the aggregate amount of the claims presented to the master by the said defendant bank against said partnership, the said indebtedness having been created by said Iredell after the dissolution of the said partnership, and without the authority of said Levi Metz.

12th. Because his Honor erred in approving the master's seventy-fifth and seventy-sixth findings of fact of his first

report, which hold that said Levi Metz intentionally drew the three checks (which are the basis of second action above stated), in January, 1891, aggregating $5,700, on the defendant bank, which paid them without any funds on deposit to the credit of said Metz. Whereas he should have held that the said checks were drawn by said Metz on the partnership bank, which was in liquidation in Iredell's hands, and largely indebted to said Metz, and that said Iredell had paid said checks.

13th. Because his Honor erred in holding that said Levi Metz was indebted to Commercial Bank of Columbia, S. C., in the second action above stated, on the said three checks in the sum of $6,934.82.

14th. Because his Honor erred in holding that said partnership was indebted to A. C. Alexander in the sum of $934.86, when the evidence showed that said claim of A. C. Alexander was created by said Iredell after the said partnership was dissolved, and without the authority of said Metz, of which the said Alexander had notice.

15th. Because his Honor erred in holding that the several certificates of deposit scheduled by the master in exhibit "V." of his first report, were liabilities of the partnership bank; when he should have held that the defendant bank having succeeded to the business of the partnership bank, and having taken all of its available assets, were primarily liable to the several certificate holders for the amount of their said several certificates, and to Levi Metz for the sum of $48,112.75, the amount due him individually for capital stock and as a depositor, by said partnership.

16th. Because his Honor erred in not holding that under the articles of partnership between said parties, that the said C. J. Iredell is liable to the said Levi Metz in the sum of $117,900.98, the aggregate amount of the losses of the partnership, less the capital stock of $25,000, which amounts to $92,900.98.

17th. Because his Honor erred in overruling the said Levi Metz's first to forty-ninth exceptions, inclusive, of the mas-

ter's first report, and in overruling the said Metz's first to thirty-first exceptions, inclusive, of the master's second report.

18th. Because his Honor erred in holding that the partnership, "The Commercial Bank of Columbia, S. C.," being a private banking institution, could not dissolve, and the mutual agency of the partners to bind each other cease and terminate, as long as there were deposits due and unpaid by the partnership to its depositors, "and that the partnership continued after the 8th day of March, 1889—at least, as to all debts by deposit then due by the partnership, and to the extent of vesting Iredell with the right to use the partnership name and assets in raising money to pay such deposits." Whereas he should have held that on the 8th day of March, 1889, that the said partnership bank was dissolved, and the defendant bank and all creditors and customers of the partnership bank then had notice of such dissolution; and that on and after that date the said Iredell's agency for the partnership terminated, and he had no right, power or authority to borrow money from the defendant bank, either by overdraft on his account in said bank as manager of the partnership bank, or by notes discounted with said defendant bank under the partnership name, or to renew such notes, or to give notes in settlement of overdrafts on his said account to said defendant bank, or to borrow money under the name of the partnership by issuing to A. C. Alexander, or any other person or persons, certificates of deposit, or to renew such certificates; and he should have further held that, after said date and the dissolution of said partnership, the said Iredell could not create any new obligation under the partnership name, and that the only authority he had was to convert the partnership property and assets into money, collect all debts due the partnership, and pay off all of its liabilities existing on the 8th day of March, 1889, the day of such dissolution, and thus wind up the partnership affairs finally and completely.

19th. Because his Honor erred in holding that the part-

nership bank could not cease to do business, dissolve, and wind up as long as it owed money to its depositors.

20th. Because his Honor erred in not holding the defendant bank liable to account to the partnership bank for all property, goods, notes, and choses in action assigned or transferred by Iredell in the partnership name to the defendant bank, as collateral to secure the claims which the defendant bank presented against the partnership and held against it, including the Gibson mortgage on the oil mill property, Pickard mortgage on stock of goods, Martin list of notes, lot of jewelry, and other notes and property.

21st. Because his Honor erred in holding: "That the subscriptions of J. K. Davis and G. W. Williams were, as matter of law, money paid over to the new bank, and on deposit in banks of good standing, subject to the draft of the agent of the new bank, such payment exceeded twenty per cent. of the capital stock then subscribed, and the certificate to the Secretary of State in this regard was true." Whereas he should have held that the said subscriptions of J. K. Davis and G. W. Williams were not paid until after the new bank begun business, and that said certificate was not true.

22d. Because his Honor should have held that, under the facts, after March 8, 1889, the plaintiff, Metz, gave Iredell neither directly nor by implication any authority to create any new debts or obligations on behalf of the partnership bank; and he should have further held that the said plaintiff, Metz, neither acquiesced in the creation of any obligations made by said Iredell after March 8, 1889, in behalf of the partnership bank, nor ratified any such obligations; and, therefore, that said plaintiff, Levi Metz, was not responsible for such new obligations created by Iredell after March 8, 1889.

23d. Because his Honor should have held, under the law and facts, that Iredell had no authority, on and after March 8, 1889, to transfer the assets and property of the partnership bank, and that defendant bank, having notice of Ire-

dell's want of authority, should be held to account for the assets and property so transferred.

24th. Because his Honor should have held that the plaintiff knew nothing of the opening by Iredell of the manager's account with defendant bank, the overdrafts made thereon by Iredell, the notes given to cover up said overdrafts, or the renewals thereof; and his Honor should have further held, that the plaintiff was not informed by Iredell, or any one else, of the character or the amount of this indebtedness until the 16th February, 1891.

25th. Because his Honor erred in holding that the return made by the corporators of the defendant bank to the Secretary of State in March, 1889, that twenty per cent. of the subscribed capital stock of the defendant bank had been paid, was true. Whereas he should have held that said return was sworn to by the defendant, Iredell, and was not true.

26th. Because his Honor erred in holding that the subscriptions of G. W. Williams and J. K. Davis were, as matters of law, money paid over to the new bank, and deposits in banks of good standing, subject to the draft of the agent of the new bank. Whereas he should have held that said subscriptions were not paid when said return was made, but was paid after the new bank began business, on the 9th day of March, 1889, and were paid by C. J. Iredell out of the assets of the partnership bank.

27th. Because his Honor should have held, from the evidence, that the defendant bank, through its carelessness and gross negligence, permitted the said C. J. Iredell to waste the assets of the partnership bank and divert them from their proper use, and thus commit a fraud upon the rights of the plaintiff.

28th. Because his Honor erred in not holding that the claims held and proven by the defendant bank were created by Iredell not in payment of deposits due by the partnership bank, but in payment of debts for which the partner-

ship bank was not liable; and the defendant bank had no equity to hold the partnership therefor.

29th. Because his Honor erred in holding that there was no necessity on the part of the partnership to borrow money to pay deposits, when the evidence showed that the assets of the partnership and the individual means of the said Levi Metz were ample to pay said deposits.

30th. Because his Honor should have found that the defendant, Iredell, never informed his partner, Metz, of the necessity to borrow money to pay off deposits, but, upon the contrary, informed him by monthly statements made after the 8th day of March, 1889, down to March 1st, 1890, that the collections of the partnership were always equal to and in excess of the demands of depositors and creditors.

*Messrs. J. S. Verner, Abney & Thomas,* and *Melton & Melton,* for appellant.

*Mr. R. W. Shand,* contra.

Sept. 25, 1895. The opinion of the Court was delivered by

MR. JUSTICE POPE. The contention in above causes involves one of the most curious set of facts among business men that we remember ever to have encountered. Briefly stated, these facts are: that in 1883, Levi Metz, while a citizen of Lexington County, in this State, being a man of sound discretion, though advanced in years, became so enamoured with the profits flowing from banking operations, that he actually embarks in a partnership, as private bankers, with a man, Mr. C. J. Iredell, without capital, and while Metz holds a large mortgage over the very roof that shelters Iredell and his family, simply upon his faith in Iredell's capacity and character as a business man. This new relation is embodied in articles of copartnership, signed by the two men. As indicating the terms of this business venture, we repeat, with the articles of partnership before us, some of the main features thereof. Its purpose is to conduct a general private banking business in the city of

Columbia, S. C. Levi Metz agrees to furnish $25,000 as its business capital. C. J. Iredell agrees to devote his time and attention to the business, to furnish all necessary clerks and messengers, to keep a complete set of books, showing plainly, at all times, the condition of said business, and have the same constantly open for the inspection of said Levi Metz, or his legal representatives; to furnish said Levi Metz all desired information as to the condition of said business, and to be responsible for the proper conduct of said business, and to that end is to have the full management thereof. All rents and expenses of said business, except the hire of clerks and messengers, are to be paid out of the gross earnings thereof, the capital remaining intact; but all such expenses and losses in excess of the gross earnings of said business, and the reserve fund hereinafter provided for, shall be borne in equal parts by the parties hereto; the liability of Levi Metz is not to extend beyond the sum of $25,000, as capital by him contributed, and Iredell agrees to indemnify him against any loss in excess of that amount. Ten per cent. of the net earnings is to be placed monthly to the credit of the reserve fund. Said reserve fund is not to be divided during the continuance of said partnership, except both parties consent thereto; and the balance of the net earnings shall be divided monthly, or at such other time as partners may agree. Upon termination of said business, Levi Metz is to draw out the capital, and the accumulated net earning and reserve fund is to be equally divided. The business of said partnership shall be conducted under the firm name, "The Commercial Bank of Columbia, S. C.," and shall continue five years from September 1, 1883. Provided, that if at end of first year it is found unprofitable, either party may terminate same upon ten days written notice to the other. With a proviso that in case of the death of one partner, the survivor shall have the privilege of purchasing the other interest. Now, this contract was signed in duplicate, each party taking a copy. No public notice was made thereof, nor was the same re-

corded as required by law. The terms of the contract were locked, so to speak, against the public. Mr. W. H. Lyles, of the Columbia bar, prepared the papers that were signed, to wit: contract in duplicate. The bank, so called, opened on 4th September, 1883. Its beginning was modest, being operated by C. J. Iredell, without assistance, in one room of a storehouse. Metz still lived in the country, but came in every week. A complete set of bank books were kept from the beginning. Gradually, as the business of the bank increased, additional clerical force was retained. A more pretentious building was after awhile leased. A vault, with safety boxes therein, was constructed. Metz had a box assigned to him for his own use, just as Iredell did. From 4th September, 1883, to 1st September, 1888, so far as the proof extends, Metz never looked into a bank book, nor did he see a single security taken; he seems to have been content with the report of Iredell: "All's well." He did influence depositors to place their money with the partnership as deposits, and on one occasion he did recognize the fact that Mr. W. T. Martin, who was a large depositor from the beginning to the end, was showing the banking firm a favor by his said deposits. Exactly when he got the information that Mr. Martin was a depositor does not appear. Mr. Metz regularly received his dividends, semi-annually. In 1884 or 1885, he made a deposit of $20,000 in said partnership bank, stipulating for ten per cent. thereon, which he received very punctually. He also made a deposit of an additional $9,000, upon which he received a great rate of interest. His sister also made a deposit with said banking firm, at ten per cent. Other depositors were made content with an allowance of six per cent. interest. Some time in the year 1885, Mr. Metz removed to the city of Columbia; he was often in the bank, but never, as before remarked, examined a book or an investment. On one occasion he discussed the propriety of allowing interest on deposits, stating to Iredell what a leading banker in the State said to him against the plan of

allowing interest on deposits. He was soon quieted by Iredell. When the first day of September, 1888, came, he had before him a statement in writing of the profits for the five years of the firm:

| | | |
|---|---:|---:|
| Dividends to July 1............................... | $24,161 | 18 |
| Dividends for two months, to September 1...... | 900 | 00 |
| Total.......................................... | $25,061 | 18 |
| Net profits reserved.................................. | 1,000 | 00 |
| | $26,061 | 18 |

| | | | | |
|---|---:|---:|---:|---:|
| Total to Levi Metz..................... | $13,030 | 59 | | |
| Interest on special fund............... | 6,000 | 00 | | |
| | | | $19,030 | 59 |

| | | |
|---|---:|---:|
| Due Levi Metz on Sept. 1st, 1888, the capital.. | $25,000 | 00 |
| Special fund, $20,000; dep't on book, $13,317.81 | 33,317 | 81 |
| One-half net profits for two months............... | 450 | 00 |
| One-half reserve fund................................. | 500 | 00 |
| | $59,267 | 81 |

Thus it will be seen that Mr. Metz, for the five years of the existence of the firm, received $13,980.59 as profits on his $25,000 capital, something more than eleven per cent. interest per annum thereon. Discussion then arose as to continuing the business. Metz expressed his readiness to do so, if Iredell would contribute one-half of the capital stock, $12,500. This Iredell explained he was unable to do. It was then agreed to proceed to wind up the business. On the 8th day of March, 1889, the liabilities and resources of the firm bank was stated by Iredell as follows:

ASSETS.

| | | |
|---|---:|---:|
| Cash.............................................. | $ 2,495 | 33 |
| Loans............................................. | 105,834 | 68 |
| Overdrafts....................................... | 41,872 | 42 |
| Bills of exchange................................. | 1,918 | 36 |
| Property account................................. | 4,359 | 99 |

| | | |
|---|---:|---:|
| Rent account............................................ | 989 | 33 |
| Bond account........................................... | 15,150 | 75 |
| Account of expenditures.......................... | 1,594 | 22 |
| Bank of Hanover..................................... | 453 | 09 |
| Peoples' Bank of Greenville..................... | 1,435 | 23 |
| Peoples' Loan and Exchange Bank.............. | 651 | 52 |
| First National Bank of Charleston............... | 533 | 06 |
| Commercial Bank, Cincinnati..................... | 68 | 97 |
| | **$177,356** | **95** |

LIABILITIES.

| | | |
|---|---:|---:|
| Capital.................................................. | $25,000 | 00 |
| Special deposit ...................................... | 20,000 | 00 |
| Deposits................................................ | 96,497 | 35 |
| Profits' account...................................... | 3,142 | 71 |
| National Bank of the Republic................... | 3,922 | 51 |
| Carolina Savings Bank............................. | 14,907 | 72 |
| Commercial Bank, Augusta, Ga.................. | 567 | 91 |
| Georgia Railroad and Banking Company...... | 2,633 | 47 |
| State Bank of Virginia.............................. | 660 | 53 |
| National Bank of Newberry....................... | 8 | 99 |
| Latham, Alexander & Co.......................... | 3,397 | 56 |
| Greenville Savings Bank........................... | 418 | 20 |
| Bills payable.......................................... | 4,750 | 00 |
| | **$177,356** | **95** |

Now think of this statement, and what it involves. Here is a private banking firm with nearly $100,000 due depositors, and the sum of $2,495.35 in cash to pay such depositors. It is true, that the loans are reported at over $105,000, and there are overdrafts for over $41,000. See the balances due other banks, for probably $25,000. Mark the significant item, "Bills payable, $4,750." And yet this firm of general private bankers are talking a few months before— placidly, we may imagine—of stopping business and winding up their affairs. Metz afterwards said, "We ought to have shut down and made the fur fly." It is not difficult

to imagine that he himself would have been compelled to lose more than many a night's sleep if he had pursued such a course. This statement, especially that last item, ought to have burnt itself in his memory, and caused him, instead of drawing dividends, interest by the thousands of dollars, and complacently lending money by the thousands of dollars, to have devoted his every energy and every dollar to paying off these depositors, but he did not; it happened that the money of other people was employed to do this beneficent work for the banking firm. But Metz was not the only member of this banking firm. C. J. Iredell was there. He knew, well knew, the financial precipice that yawned in front of him, and that much of this trouble came from his weakness and inability to say "No" to those people, who were pressing him for loans of money, that the commonest prudence ought to have told him he must refuse or be lost. His reputation as a financier was at stake. Far more than that. He had induced this trusting old man to furnish him with means with which to try his skill as banker. He knew this old man trusted him as he had never trusted mortal man before. All these considerations should have forced him to pursue a safer course than he did, and to seek to repair his errors of judgment, when once made, at an earlier day. As soon as he found Mr. Metz would not go any farther, he devised the scheme of a new bank, whose head he would be. Such was his reputation as a banker, that he soon enlisted the co-operation of others than Mr. Metz, and formed the "Commercial Bank of Columbia, S. C." He had himself elected president and a director, his son, James, a director and cashier, carrying with him into this new bank his other subordinate officials of the partnership. On the 8th day of March, 1889, he marked the partnership books "closed," and on the day of the 9th of March, 1889, he opened the chartered bank in the same building—same sign, same officials, same books and stationery, same vault. His old partner and friend, Levi Metz, was not a stockholder. His reply always, settle

up the old firm before I can talk of subscribing to the new bank. It is true, that this was a master stroke by Mr. Iredell. Here he was at the head of a new bank, whose capital stock was $100,000, which stock was taken so rapidly, that when Mr. Metz concluded he would take $10,000 in its stock, he was mortified to hear, "It is too late; all the stock is taken." Mr. Iredell, as manager of the old partnership bank, opened an account with the new bank in this wise: C. J. Iredell, manager. Having sold furniture, books, stationery, and vault to the new bank for $7,000, that sum was placed to his credit as manager; so was the cash on hand, so were some $19,000 of notes, some bonds, and a bond and mortgage for $3,000—so that his account, as said manager, was credited with $43,000. The depositors of the old bank, and its other creditors, together with Mr. Metz, made such rapid demands for their money due by the old banking firm, that it was with difficulty he met their demands; and, in fact, in order to do so, he was compelled to overdraw his account as manager and as an individual. He had helped a Mr. Pickard by way of loans; to enable him keep his feet as a merchant, he had to advance more money. To make a long story short, he had finally to take Pickard's stock. Hence he had an account in the new bank as agent. Then, too, he was a member of the Congaree Construction Company. His overdrafts, as manager, he covered by notes, reporting them to the finance committee of the board of directors. He represented to the board of directors that he had authority of the firm bank to make these notes, and that Mr. Metz knew of it, and that the assets of the firm were abundant to secure these papers. At first these notes and overdrafts were not objected to by the board of directors, being assured by Mr. Iredell that they would soon be covered. However, in 1890, the board of directors began to manifest some concern. The overdrafts were so frequent of occurrence and so tardily reduced, and then, too, they went up into the thousands of dollars. Being the paper of a firm of which Mr. Metz was a partner,

and on account of his reputed wealth, at first no concern was felt; but when all these matters reached over $40,000, the directors felt a stop must be put to it. Hence Mr. Iredell was notified to settle, and a time was fixed for such settlement. When that time was reached, there was no settlement. Accordingly, on the 12th day of February, 1891, Mr. Iredell was asked to resign. This he did. Mr. W. H. Lyles was elected president. Soon after this, a conference was held in the bank, at which were present Mr. Lyles, Mr. W. T. Martin, and Mr. Willis, of the board of directors of the new bank, Mr. Iredell and Mr. Metz. There it was Mr. Metz was told by the bank officials of the debts of the private firm of bankers, contracted with the new bank by Mr. Iredell as manager of the partnership bank. We need not repeat just here what transpired. Of course, there was crimination and recrimination between Metz and Iredell. This interview led to an investigation of the old firm transactions and assets. Thus was precipitated these two suits, whose history and whose issues are so clearly told in the decree of the Circuit Judge, and inasmuch as we feel that that decree should be reported, we will content ourselves with the statement, that the plaintiff was denied any judgment against Commercial Bank of Columbia, S. C., but, on the contrary, was decreed to pay that defendant a large sum, while the plaintiff in the second action obtained judgment against defendant. From this decree, the said Levi Metz has appealed upon thirty exceptions, which will be reported.

It now remains for us to dispose of these exceptions. So far as the 17th exception is concerned, it refers to certain exceptions taken by Levi Metz to the report of the master, without stating what matters were embodied in the same. It is very certain, under the rules adopted by this Court, as well as the decisions of said Court construing such rules, that we will not be expected to pass upon this exception in this form. It is, therefore, overruled.

The 1st, 3d, 4th, and 5th exceptions will be considered

together. It will be remembered that on the 1st of September, 1888, the partnership owed over $100,000 to its various depositors, large sums to special depositors, large sums to other banks, and had but a little more than $2,000 in cash to pay these depositors. Although a new partnership was not entered into, yet both partners well knew their banking business could not then end. It was the understanding, then, between the partners that their joint business should be so shaped as to close as soon as could be. That both partners so understood, is abundantly established by the testimony submitted at the hearing. At that time no notice of any change in the business was given to the public or to any one of their customers. On the contrary, the doors of the banking firm were kept open for all business; their sign was still allowed to be exhibited; the cashier, teller, and book-keeper, as well as manager, were kept at their posts for months afterwards. It must not be overlooked, in this connection, that unless this was true, how could Mr. Metz expect Mr. Iredell to pay all the expenses of the officers, salaries, rents, &c. If this partnership closed on the 1st of September, 1888, as required by its articles, there was no more duty imposed upon Mr. Iredell in these matters than upon Mr. Metz. It is an implied recognition by each of the partners, that this partnership was continued, that each one of them acted towards each other, in their settlements and other dealings with each other, upon the basis of the articles of partnership between them, requiring Mr. Iredell to pay all these expenses. As we before remarked, the testimony abundantly establishes this conclusion. Hence these exceptions must be overruled.

We will consider the 2d, 6th, and 8th exceptions together. It is true, the manager, Mr. Iredell, did write on the books of the partnership its closing of business at the end of the 8th day of March, 1889, and on the next day opened said books on behalf of the new bank. Still the assets of the old partnership bank were retained at the old stand, and the books that were not transferred to the new bank were

still kept there by the old partnership bank. It was to this building, as the centre of the operations of the partnership bank, that all of its customers, debtors and creditors, came. It was, in fact, simply the adoption of a new machinery, so to speak, in the conduct of the old business. The entities were kept separate and distinct one from the other. Yet the existence of the old bank was not destroyed. It required two minds to dissolve the old bank— not only that of Mr. C. J. Iredell, but that of Mr. Levi Metz—and we fail to find anywhere in the testimony that they ever thus concurred. The testimony shows that Mr. Metz still claimed that the vault and other property in the bank belonged to the old bank; it was difficult for him ever to see that when two men enter into a partnership, that the assets of said partnership are not the property of the partner who furnishes the capital. We apprehend that such is his difficulty to-day. The testimony of Mr. Iredell shows that he tried to point out this distinction to Mr. Metz, but he never accepted this view. To part with a part of the property owned by a partnership does not destroy it (the partnership). Indeed, to sell all the property will not do so, for more may be bought, or a change of some kind may be made. We have endeavored to give the testimony a patient and thorough consideration, and we must frankly say, as to these exceptions, we do not find the conclusions of the Circuit Judge here complained of either opposed to the manifest weight of the testimony or without any testimony to support it. These exceptions must be overruled.

The 9th and 11th exceptions will now be considered. Appellant admits that within the scope of a general private banking business up to 1st September, 1888, Mr. C. J. Iredell, as manager, had the power to bind such partnership. But he contends that the partnership having ceased on the 8th of March, 1889, that power to bind did not exist in Mr. Iredell, as manager, unless expressly conferred upon him by Mr. Metz. Respondents

contend that not only did the partnership continue after
1st September, 1888, and after 8th March, 1889, but also
that Mr. Metz himself conferred the power after these dates.
We have already called attention to the presence of "bills
payable, $4,750," among the liabilities of the partnership
bank set out in plaintiff's complaint in paragraph 7, as
having been rendered by Mr. Iredell, as manager, to Mr.
Metz, on the 8th day of March, 1889. It cannot be learned
through the testimony taken at the hearing that there was
the least intimation of a disapproval of such conduct of
Mr. Iredell, as manager, by Mr. Metz at that time. These
notes of Mr. Iredell, as manager, to the new bank pledging
collateral thereto, and also the guarantee of Mr. Iredell, as
manager, of the securities of the partnership bank, trans-
ferred for value to the new bank, was, in legal effect, noth-
ing more as a legal liability than a bill payable; it required
the payment of a definite sum at a definite time, or it guar-
anteed its payment according to its terms. But we have
already held that the partnership was not dissolved on the
8th March, 1889. If this exercise of power was *bona fide*,
without fraud or collusion, on the part of Mr. Iredell, as
manager, it would be a valid obligation of this partnership.
We are not averse to the utmost candor in this connection.
When we examined this testimony, it was with a fixed
purpose that if the investigation of that testimony led us
to the conclusion that the use of this power by Mr. Iredell,
as manager, was other than for the purpose of raising money
to pay off the partnership liabilities, we would reverse the
Circuit decree. We felt for Mr. Metz; his age, his faith,
his absolute surrender of himself to his partner, the con-
cealment of material facts from him by this partner, the
cruel deception practiced upon him, touched us; but when
we arose from the study of the magnificent cross-examina-
tion of the witness, C. J. Iredell, conducted by Mr. Abney,
covering 200 printed pages, coupled with other testimony
in this case, our doubts were removed. Let these excep-
tions be overruled.

Next we will consider the 12th and 13th exceptions. So far as this money, about $5,700, is concerned, we are at a loss to see any ground for a contention over it. Mr. Metz himself received every dollar of this money from the defendant bank; he applied every dollar to his own use, to wit: made loans secured by mortgage of real estate; he still retains this money. These exceptions are overruled.

As to the 14th exception, relating as it does to the claim presented under a call for creditors against the partnership bank, we fail to find anything in the testimony that mitigates against the conclusion reached by the Circuit Judge. This exception is overruled.

The 15th exception is closely allied to the 14th, just disposed of. The testimony abundantly establishes the fact that when any choses in action belonging to the partnership bank were assigned to the new bank, it was for full value. When the manager of the partnership assigned certain choses in action to secure the new bank against his overdrafts as manager, why, of course, the latter being collateral, are only the property of the new bank to the extent they may be required to pay the debts for which they are assigned. It seems to us that Mr. Metz has been really beneficially served by this new bank. All their troubles came through him, or rather through his insolvent partnership. This new bank has served this partnership in season and out of season. This new bank was not in existence when his losses were actually made. The fact that their president, who was first given power through Mr. Metz, came near being their ruin, is no small matter to them. It has virtually closed the business of the new bank, and but for the prudence of their presidents—Mr. Lyles and Mr. Childs—and the manly conduct of the directors, the depositors of the new bank might have closed its doors. This exception is overruled.

As to the 16th exception, we fail to see that Mr. Iredell is indebted to Mr. Metz in the sum here claimed. We think

full justice has been done Mr. Metz in the judgment accorded him against C. J. Iredell.

We will consider the 18th and 19th exceptions. When the decree of the Circuit Judge here assailed is considered carefully, it will be readily seen that the Circuit Judge is endeavoring to point out that, as to creditors, the partnership could not be dissolved by its members so as to destroy their right to pursue such partnership, and cause the assets to be available to the payment of their respective demands. It could not be claimed that such partnership had wound up its affairs so long as the claims of its creditors were unsettled. But, in addition to these matters, the Circuit Judge largely relied upon the testimony in the case clearly pointing to a different determination by the partners to this private banking copartnership. We are not disposed, under these views, to disturb these conclusions of the Circuit Judge.

As to the 20th exception, we think the appellant fails to grasp what the Circuit Judge did hold as to the liability of the new bank to answer fully in this action for all collaterals held by it derived from the partnership bank. Certainly they were required to account for these collaterals. The respondent claims that it has fully accounted therefor, and it seems the Circuit Judge concurred in such view. The testimony is wanting to deny validity to such finding of fact. The proofs might have been more complete on this point. This exception is overruled.

Now as to the 21st, 25th, and 26th exceptions. We confess, at the outset, that we fail to see the pertinency of the assault made by the appellant, in these actions, upon the new bank, as to its corporate existence, arising, as he contends, from the failure to have on hand twenty per cent. of the capital stock when the charter was issued to it by the Secretary of State. It is a fact that the new bank has the State's warrant—a charter—to do business as a bank. It is a fact that the representation was made by Mr. James Iredell, who had been appointed the agent of the corporators of the new bank to receive the

twenty per cent. of the stock subscribed for by the corporators. This Mr. Iredell held in the Carolina National Bank and the Central National Bank $5,000 for that purpose, and he held as deposited in the partnership the $10,000 subscribed by George W. Williams and the $6,000 subscribed by Mr. J. K. Davis. These sums were in excess of the twenty per cent. But appellant contends that it was not there to the credit of Mr. James Iredell, as agent for the corporators. It was put there for that purpose by both Mr. Williams and Mr. Davis, and, as a fact, it was so used by the new bank as part of its capital stock. Under all these circumstances, the Circuit Judge took an opposite view to that urged by the appellant. We agree with the Circuit Judge. Let the exceptions be overruled.

As to the 22d and 23d exceptions, we may remark, that we have already agreed to the finding of fact, that Mr. Iredell, as manager, had authority from Mr. Metz, his partner, to create the obligation he did with the new bank, in furtherance of their joint duty to pay the money they owed other people who were creditors of the partnership bank. Let these exceptions be overruled.

So far as the 24th exception is concerned, it may be said that Mr. Metz, in view of heavy liabilities that he was under to other people, and which liabilities were fully disclosed to him, seemed remarkably inactive. Even after the 1st of September, 1888, he did not seek to acquaint himself with the character of the assets of the partnership bank to pay such large debts. He certainly knew in March, 1889, of $4,500 of bills payable being issued by his partner. If cash was not on hand when demand was made by depositors, it had to be raised. There is a conflict in the testimony as to his knowledge of these overdrafts. Such a conflict of testimony has been solved against him, and as there is testimony to support such finding, under our well established rule, we will not interfere. This exception is overruled.

The next exception is the 27th. We find no evidence to sustain the view that the new bank was careless or grossly

negligent except in Mr. Metz's favor. The finance committee should have been more persistent against the use by Mr. Iredell, as manager, of so much of their money to pay Mr. Metz's debts. It is a great pity that they did not put the duty upon Mr. Metz to pay his own debts due to his own depositors, instead of allowing so much of their money to be so applied. This exception is overruled.

The 28th exception is virtually disposed of by the views we have already announced, but we will say that the testimony does not impress us, that Mr. Iredell, as manager, used the funds he derived from the new bank in any other way, to much extent, than in relieving the pressing demands made upon the partnership. How could this large deposit account of the partnership have been reduced to a few thousand dollars, except by the use of the new bank's money? It is admitted that Mr. Metz never added a dollar to the assets of the old firm after 8th Morch, 1889. On the contrary, he drew thousands of dollars therefrom for his own private use. Mr. Iredell was admittedly unable to help in this way to much of an extent. So practical common sense answers us, under the testimony, that these depositors and other creditors of the old bank were paid by the money of the new bank. Let this exception be overruled.

The 29th exception refers to the absence of any necessity, in view of the assets of the old bank and the private means of Mr. Metz, to borrow any money to pay the debts of the old banking partnership. There is no testimony as to the extent of Mr. Metz's means. There is abundant testimony as to the insolvency of the partnership bank in September, 1888. Let this exception be overruled.

The 30th exception. We do not doubt that Mr. Iredell, as manager, kept Mr. Metz as his partner profoundly ignorant of his wretched management of the partnership bank. All this occurred before the new bank was organized. The testimony is in the record as to the necessity of borrowing money being known by Mr. Metz. We are impressed, however, with the idea that this necessity of borrowing money

was understood by Mr. Metz to be only a temporary expedient, to be used until the funds of the partnership bank could be collected, and replace such loans. It was a sad day to both partners, when it was realized at last that the assets of the old bank were well nigh worthless for this purpose. To think that the want of firmness and candor on the part of Mr. Iredell as manager should have culminated in such disasters. There is testimony submitted which sustains the finding here complained of, and, therefore, it is overruled.

It remains now for us to dispose of the 7th and 10th exceptions. The 7th exception seems to complain that his Honor, the Circuit Judge, used incorrectly the words of "partnership at will of the old banking firm after 1st September, 1888." Our view is, that if the partnership continued after that date, it matters little what name you apply to such a condition, and hence we decline to pursue that inquiry as an abstraction.

As to the 10th exception, we may say, that while there does seem to have been some notice to depositors of the formation of the new bank, and that the old bank was attempting to close its business, yet we fail to see how this circumstance would operate to produce any effect of payment of depositors and other creditors of the old partnership bank. Until these debts were paid, this firm was an entity, and the entity that had to provide for their payment. We conceive that our previous remarks will cover this ground of appeal also.

We greatly regret that our time is too limited to enter as fully as we would like to do into the discussion of all these exceptions. We have thought much over this case, and our conclusions are the result of that reflection.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed in each of the two cases, which were heard together.

MR. CHIEF JUSTICE MCIVER, *concurring*. I concur in

the conclusions reached by Mr. Justice Pope in both of these cases. It seems to me, that the points raised by the appeal turn mainly, if not entirely, upon questions of fact, and under the well settled rule, the conclusions of fact reached by the Circuit Judge should not be disturbed by this Court, unless such conclusions are either without any testimony to support them or are manifestly against the weight of the testimony. After a careful examination of the voluminous record, I cannot say that the conclusions reached by the Circuit Judge are open to either of these objections; but, on the contrary, it seems to me that there is much in the testimony to sustain the views adopted by the Circuit Judge. I do not deem it necessary to add anything more to what is said by Mr. Justice Pope.

MR. JUSTICE GARY, *dissenting*. · On the 16th day of July, 1883, Levi Metz and C. J. Iredell entered into articles of partnership to do a banking business in Columbia, S. C., under the firm name of "The Commercial Bank," to continue for five years from the 1st day of September, 1883. Metz was to put in $25,000, and Iredell guaranteed him from any loss in excess of this capital. Iredell was to devote his time to the business, and was to have the full management thereof. This partnership bank was opened for business on the 4th day of September, 1883. Previous to that time Metz had been a farmer and surveyor in Lexington County, S. C., and by his industry and thrift had accumulated a considerable fortune. Iredell for several years prior to said year had been, and at the time of the formation of the partnership was, the cashier of the Carolina National Bank of Columbia, S. C., and enjoyed the reputation of being a man of honesty, integrity, and business capacity. Metz was frequently in the bank, but left the entire business to Iredell, who managed it exclusively—signed the papers of the bank "C. J. Iredell, Manager." The result of the first five years operation was complete insolvency, although Metz had every reason to believe, and did believe, that the business was pros-

perous. The partnership did a general banking business, loaned money, discounted notes, received deposits, sold exchange, and dealt in bonds and other securities. During said period the only knowledge Metz had of the conduct and management of said business was that furnished him by the monthly statements made out by said Iredell, commencing on the 4th day of May, 1884. Whenever the plaintiff made inquiry as to the condition of the partnership affairs, he was always assured by Iredell that the loans and discounts were well secured, and that the bank was in a prosperous condition. Dividends were declared at or near the end of the first and second years, and afterwards semiannually, beginning from the 1st of January, 1886, and were paid or credited to the partners. The total amount received by each up to the 1st day of September, 1888, was about $13,000. On the 1st day of September, 1885, the plaintiff deposited in said partnership bank $20,000, and received therefor a certificate bearing interest at the rate of ten per cent. per annum, which interest was paid up to the 1st September, 1888. At the end of five years the defendant, Iredell, upon request of the plaintiff, made a statement in writing of the profits of the whole period, from which it appears that they exceeded $26,000. Iredell well knew this statement to be false. Several bad loans had been made, which aided in causing utter insolvency at that time. This condition of insolvency was not suspected by any one in the community, and was only known by Iredell. On the 1st day of September, 1888, the day on which said partnership was limited to terminate under said articles of partnership, a continuance of the partnership was considered. The plaintiff was willing to continue the business, provided C. J. Iredell would contribute $12,500 as his one-half of the capital stock. Iredell declined to because he did not have the money. The plaintiff told him the affairs of the partnership must be wound up as speedily as practicable.

Iredell went to work to a chartered bank. This he accomplished, and a charter was obtained for "Commer-

cial Bank of Columbia, S. C." The chartered bank went
into operation on or about the 9th day of March, 1889, and
the books of the partnership bank were marked "closed" on
that day. The only difference in the name of the old and
new banks was, that the new bank omitted the word "The"
before the "Commercial." The new bank started its busi-
ness with the same officers, same sign, place of business,
pass book, checks, vault, and stationery as the old bank,
and with its good will and customers. When the partner-
ship bank closed, Iredell opened an account in the defendant
bank under his name, as C. J. Iredell, manager. All money,
assets and property of the partnership transferred to the new
bank before the 12th day of February, 1891, were credited
as cash on said account, subject to his check as manager, and
were drawn out on the check of C. J. Iredell, manager. He
deposited to the credit of said account all collections of
notes, overdrafts, &c., of the partnership bank. Through
the operations of this account, after the 8th day of March,
1889, up to the 12th of February, 1891, when he resigned,
Iredell created large overdrafts in the defendant bank, which
he closed up by notes under his name as C. J. Iredell, man-
ager. All the claims of the defendant bank save two (those
of Green and Ford, which were assigned to said bank,)
against the partnership bank, grew out of the operations of
said manager account, and were created by said Iredell after
the 8th day of March, 1889. The new bank when it com-
menced business purchased sundry notes of the partnership,
under the guarantee of said C. J. Iredell, manager, and pur-
chased also the vault, furniture, books, &c., at an agreed
price, also balances then due by other banks. For the ag-
gregate of these rediscounts and purchases, Iredell took
credit on the books of the defendant bank, of date 9th March,
1839, in the name of C. J. Iredell, manager, for $43,294.29,
which in a few days thereafter was checked out and applied
to the partnership indebtedness. On the 12th of February,
1891, the defendant, Iredell, conveyed and transferred to the
new bank certain property which will be hereinafter more

fully mentioned. The foregoing statement is intended merely as an outline of the facts connected with this very voluminous case, which contains 903 pages of printed matter, besides the elaborate and able arguments of the respective attorneys.

When we come to a consideration of the exceptions, we will then refer more specifically to the facts of the case, that touch upon the questions raised by the exceptions. A reference to the decree of his Honor, Judge Aldrich, will show the different steps which have been taken during the progress of this case. The appellant's exceptions are thirty in number, and very lengthy. We will not consider them *seriatim*, but will endeavor to state our views upon all questions properly arising under them. The first question raised by the exceptions which we will consider is: Was the partnership bank dissolved in March, 1889? The Circuit Judge and master both have found that the partnership was not dissolved at that time. In reaching the conclusion at which we have arrived, we are not to be understood as intending in any manner to contravene the well established rule of this Court, that findings of fact by the master, in which the Circuit Judge has concurred, will not be reversed unless they are not supported by any testimony or are against the manifest weight of the evidence. We feel less hesitation in concluding that this finding by the master, in which the Circuit Judge has concurred, should be reversed, because we have reached our conclusions by drawing, in our opinion, the reasonable and correct inference from those facts which in the main are not disputed: 1. After the 1st of September, 1888 (the time when the partnership was to be discontinued, as set forth in the articles of partnership), there was no agreement that the partnership should continue its banking operations for a definite period of time. 2. Metz was not willing to renew the partnership unless Iredell would contribute $12,500 as his one-half of the capital stock, which Iredell could not do for the lack of means. 3. Iredell knew that the affairs of the old bank would have to be settled up

shortly after the time fixed for its limitation by the articles of partnership, and, therefore, set about getting a charter for a new bank. 4. The nature of the property sold to the new bank when it commenced business, to wit: vault, &c., was such that without it the old bank could not carry out the purposes of its organization. 5. Neither could the partnership bank accomplish the purposes for which it was organized, when the new bank assumed substantially the name of the old bank, started business with the same officers, same sign, same place of business, same furniture, &c., and with the good will and customers of the old bank. 6. Iredell made collections of the partnership assets through the new bank, and kept an account with the new bank touching the partnership affairs under the name of C. J. Iredell, manager; thus showing that the old bank was doing no active banking business whatever at that time. We are satisfied that the manifest weight of the testimony is against the finding of the master, concurred in by the Circuit Judge. The respondent, however, contends that a partnership formed for the purpose of dealing in money—as a banking partnership—the money so dealt in is not an incident to the business, but is the business itself. That notes given or debts due for bank furniture are incidental, deposits are the very business of the company; therefore, the partnership was not dissolved until the deposits were paid, and that for the purpose of paying off the deposits, Iredell had the right to act for the partnership as fully as when the partnership was in active business, under the articles of partnership. By reference to the articles of partnership it will be seen that it was organized "for the conduct of a general private banking business." It loaned money, discounted notes, received deposits, sold exchange, and dealt in bonds and other securities. It was clearly the understanding of all parties concerned that the old bank was not to receive deposits after March, 1889. We can not accept the view of respondent's attorneys, that deposits were the very business of the company. The receiving of deposits and making payments

thereof, was only an incident of the "general private bank-ing·business" for which the partnership was formed, but by no means the sole purpose of its organization.    The amount due the depositor was on the same footing with any other debt against the partnership.    There was nothing in the fact that depositors had claims against the old bank, that would cause a continuation of its existence, in the face of such facts·as otherwise would have worked a dissolution. The respondent contends that even if the Circuit Judge was wrong on the points so far discussed, still his decree must stand, unless he was also wrong in his finding of fact, that Metz authorized Iredell to borrow for the firm after March, 1889, and thereby made Metz liable for loans so made.    It is not contended that there was any direct authority for such purpose; and, in our opinion, the manifest weight of the testimony is to the contrary.    The circumstances show that Metz had no idea that the partnership was insolvent, and that there was a necessity to borrow money to wind up its affairs.

We will next consider the effect of the purchase by the defendant, in March, 1889, of the vault, furniture, sundry notes, &c., aggregating $43,294.29.    It appears that this was a fair price for the property, and that every dollar of said amount was paid towards the extinguishment of the partnership indebtedness.    Under these circumstances, even conceding that Iredell had no right to sell such property, nevertheless the defendant bank became subrogated to the right of the partnership creditors, and have a right to set up this equity against the plaintiff's claim. *Bailey* v. *Bailey*, 41 S. C., 337; *Givins* v. *Carroll*, 40 S. C., 413. The plaintiff's demand growing out of the sale of said property cannot, therefore, be sustained.

We will now consider the effect of the assignment by Iredell of the property mentioned in "A," on the 12th day of February, 1891, to wit: "Assets of partnership bank traced to defendant bank, held by bank as collateral. 1. Notes, as per Martin list, $7,603.62.    2. Gibson bond and mortgage

$5,000. 3. Twelve notes and liens to Gibson. 4. $10,000 of stock of the Columbia Oil and Fertilizer Co. 5. $900 stock of the Ninety-Six Oil Mill Co. 6. Package of forty-nine notes. 7. Lot of jewelry. 8. $5,000 stock in Congaree Construction Co. 9. Stock in the Piedmont L. I. & I. Co. 10. Real estate: Epstin farm, Smith house, Peavy place, Harmon land, O'Hanlan tract. (This excludes the assets of the old bank transferred to the new bank 9th March, 1889)." The property aforesaid was conveyed and transferred to the defendant bank by Iredell to secure the payment of new obligations entered into by Iredell after the dissolution of the partnership, except the Green and Ford certificates which had been assigned to the defendant bank, and upon which the Circuit Judge found there was due on the 1st of September, 1894, the respective sums of $1,350 and $124.50. Iredell had no right to contract new obligations after the dissolution of the partnership, and the transfer, therefore, of property belonging to the partnership, to secure payment of obligations for which the partnership was not liable, was null and void. The defendant bank, however, is not accountable for said property or its value in case it has been disposed of, for the following reasons: When the defendant bank made the loans to Iredell it supposed, and there were good grounds for it to suppose, that the assets of the partnership were pledged to secure the payment of said loans; the evidence shows that said loans were used by Iredell in satisfying the partnership indebtedness to a greater amount than the value of the property transferred as aforesaid. It would, therefore, be inequitable, under the circumstances, to require the defendant bank to account either for the property or its value, except as hereinafter mentioned as to the Green and Ford certificates.

We will next consider so much of the decree as renders judgment against Metz and Iredell, as partners, in favor of the new bank. The Circuit Judge finds that Levi Metz and C. J. Iredell, as partners, are indebted to the bank in the sum of $54,920.64, as per statement set out in his decree.

All the items therein set forth, except the Green and Ford certificates, are new obligations of Iredell, entered into after the dissolution of the old bank.    The old bank is not liable for any of said items, except the Green and Ford certificates, and his finding should be modified so as to include only these two demands, which should be paid out of the property assigned by Iredell for the purpose of paying them.

The appellant contends that it was error on the part of his Honor, the presiding Judge, to allow the claim of A. C. Alexander.   The master, in his report, says: "The facts as to this claim are substantially these: A. C. Alexander had deposited with the defendant, Iredell, and obtained certificates of deposit two or three times in 1887 and 1888; these were subsequently paid.   Afterwards, on the 17th of May, 1889, he went again and handed to the defendant, Iredell, a check for $500 and $150 in cash, and received from him a certificate, No. 118, in the usual form, signed 'C. J. Iredell, manager of the Commercial Bank of Columbia.'   Subsequently on the 22d of July, 1890, he went back, and to the face of the certificate and interest to that date he added $61.65 in money, and obtained the certificate No. 130 for $750, in evidence as 'G.' * * * He did not recollect when the new bank began operation, and supposed that the old bank was in operation on the 17th of May, 1889, and that he was dealing with it as before.   When he obtained the last certificate he asked no questions, and seems to have had no definite idea as to what bank he was dealing with," &c. The evidence shows that the transaction took place with the president of the new bank after the dissolution of the old bank.    Under these circumstances, the defendant bank is liable to Alexander.    If for any reason Alexander should not be able to collect his demand from the new bank, then the partnership bank would be compelled to make payment to him, as he did not have notice of the dissolution, although he had been a customer of the old bank.

The appellant complains of error on the part of the Circuit Judge in not holding that the corporators of the bank

bad falsely certified to the Secretary of State, in March, 1889, that twenty per cent. of the capital stock had been paid in. While we might decline to consider the exception raising the question, on the ground that it only raised an abstract question, we may say that we agree with the Circuit Judge in the view which he has expressed in his decree.

The Circuit Judge has found that C. J. Iredell is indebted to Levi Metz in the sum of $48,112.75; the views hereinbefore expressed necessitate a restatement of the account between said partners.

There were two causes of action heard together by the master and Circuit Judge, and we will proceed to a consideration of the question raised by the exceptions under the second cause of action, being that of the Commercial Bank of Columbia, S. C., against Levi Metz. The facts are, as follows: In January, 1891, Metz, having no deposit in the defendant bank, drew three checks on this bank aggregating $5,700, which were paid and charged to him, creating an overdraft of $5,700. The overdraft was wiped out on the books of the bank by Iredell's check for $2,600, on his overdrawn account, and by a deposit slip for $2,500, plus $600, making $3,100, which Iredell made out in Metz's name and put to Metz's credit, and carried by the teller as "cash in hand," until the 24th of January, when the whole $5,700— that is, the check of Iredell for $2,600 and the deposit slip for $3,100—were changed back to Metz, who knew nothing of the credits on his account. Neither the check of Iredell nor the deposit slip ever yielded a cent to the bank. As the check was drawn on the new bank, and Metz received the money, or got the benefit thereof, we are satisfied, in view of all the facts and circumstances in the case, that the Circuit Judge was correct in rendering judgment against Metz for the amount stated in his decree.

For the foregoing reasons, we dissent from the judgment of the majority of the Court.